1  Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2  2901 W. Coast Hwy., Suite 200
3  Newport Beach, CA 92663
Office: (949) 270-2798
4  Email: rnathan@nathanlawpractice.com

5
Ross Cornell, Esq. (SBN 210413)
6  **LAW OFFICES OF ROSS CORNELL, APC**
7  40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
8  Office: (562) 612-1708
9  Email: rc@rosscornelllaw.com

10  Attorneys for Plaintiff, SHAHD ERAKAT

11

12          **UNITED STATES DISTRICT COURT**

13          **EASTERN DISTRICT OF CALIFORNIA**

14

15

16  SHAHD ERAKAT, on behalf of herself    Case No:
and all similarly situated persons,
17
                                         **CLASS ACTION COMPLAINT**
18          Plaintiff,
v.                                         **1) CAL. PENAL CODE § 638.51**
19
20  SKECHERS U.S.A., INC., a Delaware
corporation,
21
22          Defendants.

23

24

25

26

27

28

                    1

Plaintiff SHAHD ERAKAT ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendants SKECHERS U.S.A., INC., a Delaware corporation ("Defendant" or "SKECHERS"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.skechers.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics 4 / Tag Manager / DoubleClick)
- Taboola Tracker
- The Trade Desk Tracker

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by distinct third parties, including Google LLC (Google Analytics 4, Tag Manager, and DoubleClick), The Trade Desk, Inc. (adsrvr.org identity and bidstream tracking network), and Taboola, Inc., a registered California data broker (content-recommendation and behavioral advertising platform). Defendant aids, employs, agrees, and conspires with these Third Parties by embedding and activating their tracking technologies within the Website, thereby causing the automatic transmission of users' communications, identifiers, and behavioral metadata to external advertising and data-broker servers. These transmissions enable the fingerprinting and profiling of users, cross-site identity synchronization, and participation in real-time bidding and targeted-advertising exchanges through which Defendant and the Third Parties jointly monetize visitors' personal information and browsing activity.

9.     On information and belief, Defendant's Website is further equipped with additional third-party trackers that function as pen registers and/or trap-and-trace devices or processes, including those operated by Pinterest, Inc. (Pinterest Tag), Snap Inc.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

(Snapchat Pixel), and IntentIQ, LLC, a registered California data broker (Identity Graph Sync Tracker). Each of these third-party systems automatically activates upon page load and transmits users' addressing, routing, and signaling information—such as IP addresses, referrer URLs, browser fingerprints, and unique device identifiers—to their respective remote servers without consent or court authorization. The Pinterest Tag performs cross-site retargeting by collecting referrer and browser metadata for ad-profiling; the Snapchat Pixel captures IP and device information for advertising attribution; and IntentIQ's identity-graph tracker performs cross-domain user-ID synchronization that correlates browser identifiers across multiple sites. Collectively, these transmissions constitute intentional acquisition of addressing and signaling data for behavioral advertising and identity resolution.

10.    Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.    The invasiveness of Defendant's data-collection practices is amplified by the entities operating the embedded trackers, which capture Plaintiff's and Class Members' IP addresses, device identifiers, and other routing and behavioral information. The Google trackers (Tag Manager, Analytics 4, and DoubleClick), Taboola, and The Trade Desk, together with additional integrations including Pinterest, Snapchat, and IntentIQ, aggregate the data they collect from the Website with information derived from users' activity on other websites and advertising platforms. These entities append the IP addresses, browser fingerprints, and behavioral identifiers of Website visitors to pre-existing profiles within their advertising, measurement, and identity-resolution systems, and use those combined datasets to monitor and track Plaintiff and Class Members across the Internet. The resulting composite profiles are then shared with or made accessible to downstream advertisers, demand-side platforms, and affiliated data brokers, enabling precisely targeted and identity-based advertising driven by each visitor's personal, behavioral, and device-specific characteristics.

13.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

14.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

16.    Plaintiff SHAHD ERAKAT is a California citizen residing in Solano County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period prior to the filing of the complaint in this matter.

/ / /

17.    Plaintiff visited the Website for personal purposes on multiple occasions including but not limited to on or about September 29, 2025. On such occasion(s), Plaintiff interacted with the Website's homepage which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing and addressing information as described herein. Plaintiff visited multiple product pages for the purpose of viewing max cushioning elite, go walk flex, summit, d lite, air dynamight and slip-in style shoes for potential purchase.

18.    Defendant SKECHERS U.S.A., INC. ("Defendant" or "SKECHERS") is a Delaware corporation with its headquarters and principal place of business at 228 Manhattan Beach Blvd, Manhattan Beach, CA 90266. SKECHERS owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

19.    SKECHERS is a major American footwear and lifestyle company. Founded in 1992, Skechers has grown into one of the world's largest and most recognized consumer brands, offering innovative footwear and apparel to millions of customers across more than 180 countries. Through its extensive network of company-owned retail stores, authorized distributors, and online platforms, including its flagship website, www.skechers.com, SKECHERS maintains a significant presence in both the brick-and-mortar and digital retail markets.

20.    SKECHERS employs tens of thousands of workers worldwide in its design, production, logistics, retail, and corporate divisions. The company's core business centers on developing, marketing, and selling performance and lifestyle footwear, apparel, and accessories for men, women, and children. Its diverse product lines include fashion sneakers, performance running shoes, workwear, sandals, and athleisure apparel, which are sold directly to consumers through Skechers retail stores, partner retailers, and the Website.

21.    The Website serves as a cornerstone of SKECHERS' e-commerce and customer-engagement operations. It allows users to browse product collections,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

customize selections, access sizing and fit guidance, manage orders and returns, and enroll in SKECHERS' loyalty and promotional programs. The Website operates as a comprehensive digital storefront, extending the reach of SKECHERS' global retail presence and serving as a primary platform for online sales and brand interaction.

22.     In addition to retail functions, the Website is deeply integrated with SKECHERS' broader digital ecosystem, including its marketing automation, analytics, and customer-relationship-management systems. Through cookies, tracking pixels, and embedded analytics tools, SKECHERS collects and utilizes user data. As part of this integrated infrastructure, the Website functions as both a commerce engine and a data-driven marketing hub within SKECHERS' global digital strategy.

## III.    JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

24.     This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Eastern District of California by regularly engaging with individuals in California through its website.  Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

25.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

26.     This Court has personal jurisdiction over Defendant because Defendant has purposefully directed its activities to County of Solano, California by regularly engaging with individuals in California through its website, including but not limited to engaging in marketing activities and the sale of products to consumers. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

27.     Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

28.     CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

29.     A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

30.     Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

31.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

32.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

33.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

34.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

35.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107,

at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

36.     The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

37.     Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

38.     Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.     *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

39.     When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

/ / /

40.    In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

41.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



42.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

43.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the

Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

44.     Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

45.     An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*, 191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

46.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

47.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the

---

[1]     *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

48.     Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

49.     In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

50.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

51.     An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

52.     The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing

those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

53.    Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

/ / /

_____

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 3:**

2

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

54. A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

55. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

56. A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

57.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

58.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

59.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

60.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example,

---

[4]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9]  Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10]  *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

61.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

62.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

63.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

64.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

65.    The collection of IP addresses here is particularly invasive here: As a report

---

[11] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.
[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.
[13] *Id*.
[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.
[15] *Id*.
[16] *Id*.
[17] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1   from NATO found:

2           [a] data broker may receive information about a[]
        [website] user, including his … IP address.  The user then
3       opens the [website] while his phone is connected to his
        home Wi-Fi network.  When this happens, the data broker
4       can use the IP address of the home network to identify the
        user's home, and append this to the unique profile it is
5       compiling about the user.  If the user has a computer
        connected to the same network, this computer will have
6       the same IP address. The data broker can then use the IP
        address to connect the computer to the same user, and
7       identify that user when their IP address makes requests on
        other publisher pages within their ad network.  Now the
8       data broker knows that the same individual is using both
        the phone and the computer, which allows it to track
9       behaviour across devices and target the user and their
        devices with ads on different networks.[18]

10

11          66.     In other words, not only does the collection of IP addresses by the Third

12  Parties cause harm in and of itself, data brokers use IP addresses to identify users, append

13  the IP address to a unique profile containing even more information about the user,

14  attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class

15  Members across the Internet using their IP addresses, compiling vast reams of other

16  personal information in the process.

17          67.     For these reasons, under Europe's General Data Protection Regulation, IP

18  addresses are considered "personal data, as they can potentially be used to identify an

19  individual."[19]

20          68.     When companies build their websites, they install or integrate various third-

21  party scripts into the code of the website in order to collect data from users or perform

22  other functions.[20]

23

24  [18] Henrik Twetman & Gundars Bergmanis-Korats, NATO Strategic Communications
    Centre Of Excellence, Data Brokers And Security at 11 (2020), https://stratcomcoe.org/
25  cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.
26  [19] Is an IP Address Personal Data?, Convesio, https://convesio.com/knowledgebase/article/is-
    an-ip-address-personal-data/; see also What Is Personal Data?, European Commission,
27  https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.
28  [20] See Third-party Tracking, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party
    tracking refers to the practice by which a tracker, other than the website directly visited by the user,
    traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  69.   Often times, third-party scripts are installed on websites "for advertising
2  purposes."[21]

3  70.   Further, "[i]f the same third-party tracker is present on many sites, it can
4  build a more complete profile of the user over time."[22]

5  71.   Defendant has long incorporated the Trackers' code into the code of its
6  Website, including when Plaintiff and Class Members visited the Website. Thus, when
7  Plaintiff visited the Website, the Website caused the Trackers to be installed on
8  Plaintiff's and other users' browsers.

9  72.   As described below, when a user visits the Website, the Website's code as
10  programmed by Defendant installs the Trackers onto the user's browser. This allows the
11  Third Parties through their respective Trackers to collect Plaintiff's and Class Members'
12  IP addresses, Device Metadata, and User Information, and pervasively track them across
13  the Internet.

14  73.   Public IP addresses play a significant role in digital marketing by enabling
15  geographic targeting based on a user's approximate location. Through IP geolocation
16  services, advertisers can often determine a user's country, region, city, and in some
17  cases, ZIP code or service area. In contexts where a static IP address is associated with
18  a fixed residence or business, this data can contribute to household-level or business-
19  level targeting, particularly when combined with other tracking identifiers and third-
20  party enrichment.

21  74.   Defendant and the Third Parties then use the public IP addresses, Device
22  Metadata, User Information, and other information of Website visitors that are collected
23  and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize
24  Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich
25  themselves through this improperly collected information. Defendant installs Trackers

26

27  _____
are present on multiple websites. They collect and send information about a user's browsing history
to other companies…").
28  [21] *Id*.
   [22] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

75.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Trackers or Beacons and Digital Fingerprinting***

76.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

77.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

78.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used

to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

79.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

80.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

81.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

82.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

/ / /

83.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.      *Plaintiff And Class Members' Data Has Financial Value***

84.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

85.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

86.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

87.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

88.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

89.     The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

90.     Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

91.     The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

92.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

93.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

94.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent

user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

95.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.     *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy***

96.     The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

97.     As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

98.     To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

99.     In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device

Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a. Data Brokers And Real-Time Bidding: The Information Economy

#### *Data Brokers*

100.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

101.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). Taboola, Inc. and IntentIQ, LLC operate trackers employed by Defendant on the Website and are both registered California data brokers.

102.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.
[30] SHERMAN, *supra*, at 2.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

103. For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

104. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

105. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

106. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual

---

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.
[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id*.
[35] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many

industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

107.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

---

[36] *Id.*
[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 4:**

2



22    108.    As noted above, data brokers are able to compile such wide swaths of

23    information in part by collecting users' IP addresses, Device Metadata, and User

24    Information, which is used by data brokers to track users across the Internet.[38]

25    / / /

26

27    / / /

28

---

[38] *Id.* at 11.

109.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

110.   These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

111.   In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

112.   As a result of Defendant's installation of trackers operated by data brokers such as Taboola and IntentIQ, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

113.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

114.    Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

115.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

116.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

117.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like The Trade Desk here, help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

118.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id.*

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, *e.g.*,

The Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5:**



119. Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road.

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**



120. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

121. Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

122.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

123.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

   a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

   b.   "send[ing] sensitive data across geographic borders."

   c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

124.   Given The Trade Desk operates a DSP here, the last point is particularly relevant, as it means The Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

125.   Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[47] Geoghegan, *supra*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

126.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

**Figure 7:**



127.  All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

128.  It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like Intent IQ and Tabooa who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its

---

[48] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

129.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

130.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET*
>
> *request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

**Figure 8:**



131.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

132.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing

---

[51] Papadopoulos, *supra*, at 1433.
[52] Papadopoulos, *supra*, at 1434.
[53] *Id.*

37

history."[54] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

133. Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

134. Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

135. To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

/ / /

---

[54] *See id.*
[55] *Id.*
[56] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

136.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

137.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

138.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

139.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

140.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

141.    Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

142.    The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

143.    The Trade Desk's infrastructure performs identity matching and cross-domain audience aggregation functions that expand the scope of behavioral data captured through the Website. By associating each browser session with unique identifiers such as the TTDID, upid, and advertiser_id values, and by synchronizing those identifiers through match.adsrvr.org and related endpoints, The Trade Desk system constructs persistent user profiles that extend across multiple sites, sessions, and devices. The Trade Desk operates as a demand-side platform that ingests this behavioral and device-level information into its real-time bidding network, enabling advertisers to purchase targeted impressions based on individualized audience segments. These processes convert raw routing and behavioral data collected from the Website into marketable identity-linked profiles within The Trade Desk's programmatic advertising ecosystem.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# V.     SPECIFIC ALLEGATIONS

## 1.     The Google Trackers

144.   The Google Trackers are digital analytics and tag management technologies operated by Google LLC, consisting of Google Analytics and Google Tag Manager. Together, these tools enable Google and its advertising and analytics clients to collect detailed interaction data, monitor engagement, and coordinate the deployment of additional tracking scripts. Google Tag Manager functions as a container that injects other tracking tags into the Website. Google Analytics measures and reports user behavior in granular detail for profiling, marketing optimization, and targeted advertising purposes.

145.   When implemented on the Website, the Google Trackers collect a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and behavioral interaction data such as page views and navigation paths. Google Analytics captures detailed technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers, often placed via cookies or JavaScript storage objects, allowing Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles.

146.   The Google Trackers monitor user engagement signals on the Website, including page views, link clicks, and navigation patterns, and transmit those interaction signals to Google's analytics and advertising infrastructure. Google Analytics executes through JavaScript calls to domains such as www.google-analytics.com and analytics.google.com. Google Tag Manager is embedded within the Website and initiates requests to www.googletagmanager.com as part of the initial page load. Through this container, Google Tag Manager deploys additional Google services, including advertising tags, without any action by the Plaintiff.

147.   Figure 9 below shows a sequence of network requests captured within the browser's developer tools, displaying multiple entries directed to third-party advertising

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  and analytics domains. The addressing information is represented by the visible Name

2  and Path fields, which identify the specific remote hosts and resource locations contacted

3  from the skechers.com environment. The routing information appears in the Protocol

4  and Time columns, showing how each connection was transmitted over HTTP/2 or

5  HTTP/1.1 and documenting the sequence and timing of the network paths through which

6  the browser reached the external servers. The signaling information is reflected in the

7  Method field, where GET and POST commands record the initiation and transmission

8  of each individual request. The displayed data collectively constitutes direct evidence of

9  the network metadata defining the protocol, endpoint, and communication context for

10 these transactions and demonstrates the addressing, routing, and signaling sequence

11 through which the browser connected to third-party advertising and analytics servers.

**Figure 9:**



25  148.   Figure 10 below shows a real-time network capture recorded through

26 Fiddler, listing multiple HTTPS and HTTP connections established during the live

27 browsing session. Each visible entry includes Result, Protocol, Host, and URL fields,

28 showing successful status codes (200 and 204) and concurrent transmissions to external

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  domains such as analytics.google.com, adservice.google.com, insight.adsrvr.org,

2  match.adsrvr.org, s.yimg.com, and ingest.quantummetric.com. The addressing

3  information is reflected in the Host and URL columns, which identify the specific

4  external servers contacted from the client environment. The routing information is

5  shown by the Protocol column, which displays HTTPS and HTTP tunnels documenting

6  how connections were negotiated and maintained with remote hosts. The signaling

7  information appears in the Result codes, which confirm the completion of HTTP

8  transactions and server responses during the session. The displayed data provides

9  verifiable network records evidencing the transmission path, protocol negotiation, and

10 endpoint identification of each observed exchange captured in real time.

**Figure 10:**



24  149.  Figure 11 below shows a real-time Fiddler capture documenting a GET

25 request transmitted from the client browser to an external DoubleClick server. The

26 visible request fields include parameters labeled src, type, cat, ord, npa, and auiddc,

27 together with standard HTTP headers showing Host, Connection, Pragma, User-Agent,

28 and Referer values. The User-Agent string identifies the device and operating system as

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    an iPhone running iOS 18_5, while the Referer field identifies the originating

2    skechers.com domain. The addressing information is reflected in the Host and Referer

3    headers, the routing information appears in the HTTP/1.1 protocol and connection

4    directives, and the signaling information is shown by the GET method and structured

5    parameter pairs contained in the request. The displayed data captures the precise

6    signaling and header parameters exchanged between the browser and the external server

7    during the live session and provides verifiable network records evidencing the

8    addressing, routing, and signaling metadata that define the communication channel

9    between the client and the DoubleClick endpoint.

10    **<u>Figure 11:</u>**



23      150. Figure 12 below shows a Fiddler capture reflecting HTTP responses

24    exchanged between the client browser and external servers during a live browsing

25    session. The visible fields identify Result, Protocol, Host, and URL entries, each

26    displaying successful 200 status codes for HTTPS and HTTP connections. The

27    associated response headers include "Set-Cookie: FPID2=FPID2.0…" and "Via: 1.1

28    google," confirming that the connection passed through Google's edge network. The

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  addressing information is represented by the Host entries identifying the remote domains
2  reached by the client, the routing information is evidenced by the HTTPS and HTTP
3  protocol designations showing the transport path, and the signaling information appears
4  in the response status codes and header directives that record acknowledgment of each
5  transaction. The displayed data provides verifiable network records evidencing the
6  transmission path, header configuration, and endpoint identification of the observed
7  exchange, and shows that Google's infrastructure actively participated in the routing
8  layer of the communication.

9  **Figure 12:**



22  151.  Figure 13 below shows a DevTools capture listing multiple cookies stored
23  in the browser following the initial page load. The visible entries include _ga, _gid, and
24  _gcl_au, each containing alphanumeric values and expiration dates extending into the
25  year 2026. Additional cookies such as _fbp, _dcid, _br_uid_2, and *attn* appear alongside
26  session and persistent identifiers associated with the skechers.com domain. The
27  addressing information is reflected in the Domain column showing the host context
28  where each cookie originated, the routing information appears implicitly in the session-

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

state parameters that link the client to the corresponding server endpoint, and the signaling information is captured in the paired Name and Value fields that define the transmitted identifiers. The displayed data constitutes direct evidence of the network metadata defining the protocol, endpoint, and communication context for this transaction and demonstrates that unique, persistent identifiers were generated and stored in real time during the live connection.

**<u>Figure 13:</u>**



152.   Figure 14 below shows a DevTools network capture displaying a POST request labeled collect?v=2, recorded within an active browsing session. The visible fields include payload parameters such as sr=430x932, ul=en-US, and multiple header entries including User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/18.5 Mobile/15E148 Safari/604.1. The addressing information appears in the Request URL and Origin headers identifying the skechers.com domain, the routing information is reflected in the Status Code 204 and HTTPS protocol confirming successful transmission, and the signaling information is shown in the Accept, Accept-Encoding, and Sec-Fetch header

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  group governing the communication method. The displayed data captures the precise
2  signaling and header parameters exchanged between the browser and the external server
3  during the live request, providing verifiable evidence of the addressing, routing, and
4  signaling metadata defining the connection.

**Figure 14:**



153.    Figure 15 below shows a packet capture displaying multiple DNS queries
and responses exchanged between Source 10.2.0.2 and Destination 9.9.9.9 during an
active browsing session. The visible entries identify hostname lookups for
googletagmanager.com, analytics.google.com, googleads.g.doubleclick.net,
adservice.google.com, and googleadservices.com, each resolving to IP addresses
including 172.253.117.97, 216.239.36.181, 142.251.188.155, and 172.253.117.154. The
addressing information is represented by the client IP 10.2.0.2 and the listed external
Google server addresses, the routing information is shown by the DNS query–response
sequence between 9.9.9.9 and 208.67.222.222, and the signaling information appears in
the recorded "Standard query" and "Standard query response" messages that confirm
network-level acknowledgment and resolution. The displayed data provides verifiable

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange, establishing that the client's IP address was transmitted to multiple Google-operated domains in real time.

**Figure 15:**



154.    Figures 9 through 15 together illustrate the continuous network sequence by which the Website's embedded code initiated and completed transmissions of user metadata to multiple third-party endpoints. Figure 9 captures the browser's initial outbound GET request directed to a DoubleClick domain, establishing the first external connection and recording the user's addressing path from the client to Google's ad infrastructure. Figure 10 shows the corresponding response headers, including the "Via: 1.1 google" field, evidencing routing acknowledgment through Google's edge servers. Figure 11 displays the request's header configuration, including User-Agent, Referer, and Accept fields, representing the signaling metadata exchanged during the live session. Figure 12 records the creation of persistent cookies such as _ga, _gid, and _gcl_au, showing how unique identifiers were stored contemporaneously with those network transmissions. Figure 13 presents the parameterized payload fields sr=430x932 and

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

ul=en-US, demonstrating that device dimensions and language data were transmitted as part of the same communication event. Figure 14 confirms additional network metadata associated with the collect call sequence, documenting the ongoing browser-to-server dialogue within the active connection. Figure 15 depicts the DNS transactions linking the client IP 10.2.0.2 to external hosts including googletagmanager.com, analytics.google.com, doubleclick.net, and googleadservices.com, completing the addressing and routing chain. Viewed together, these figures form a single evidentiary record showing how the Website's page load triggered a real-time data exchange that progressed from local request initiation to external resolution and identifier persistence across Google's advertising ecosystem.

155.   Defendant surreptitiously installed and executed the Google Trackers onto users' browsers by embedding Google Tag Manager in the Website's source code. When a user visits the Website, their browser automatically executes this container script, which dynamically injects Google Analytics and initiates outbound network requests to Google's servers, transmitting metadata including page URL, referrer information, browser details, and session identifiers as part of a third-party tracking, profiling, and advertising system.

156.   The Google Trackers are at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

157.   The Google Trackers are at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

158.   The Google Trackers function as a pen register and/or trap and trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as URLs visited, click paths, timestamps, and referrer headers and also process incoming metadata such as analytics responses and cookie-based session identifiers. These transmissions occur automatically during page load and without user

1  participation, enabling Google to continuously log user behavior and associate it with
2  broader tracking profiles.

3      159.  Defendant never obtained a court order permitting the installation of a pen
4  register or trap and trace device or process and did not obtain Plaintiff's or the Class
5  Members' express or implied consent to install the Google Trackers on Plaintiff's and
6  Class Members' browser or to collect or share data with Google.

7      160.  Consequently, the Google Trackers violate CIPA regarding unauthorized
8  use of a pen register and/or trap and trace device without prior consent or court order.

9  *2.    The Taboola Tracker*

10     161.  The Taboola Tracker is a behavioral advertising script implemented
11  through Taboola's recommendation and retargeting platform, typically delivered via
12  domains such as cdn.taboola.com and trc.taboola.com. On the Website, the Taboola
13  Tracker is loaded automatically during the initial page session and executes in the
14  background through embedded code integrated with the site's marketing tags. When
15  active, it establishes a live connection to Taboola's external servers, enabling continuous
16  transmission of metadata without any visible user action or interface component.

17     162.  As soon as a page on the Website loads, the Taboola Tracker initiates
18  asynchronous requests that capture user-interaction and engagement signals, including
19  page views, dwell time, scroll depth, and referral paths. These data points are transmitted
20  directly to Taboola's network infrastructure, allowing persistent association between the
21  session activity and Taboola's broader content-distribution environment, even when the
22  user does not interact with any Taboola-branded widget or placement.

23     163.  The data gathered through the Taboola Tracker facilitates identity and
24  behavior profiling by linking browsing sessions on the Website with device-level
25  identifiers maintained within Taboola's advertising ecosystem. The system employs
26  persistent cookies and local storage values to recognize returning browsers, enabling
27  Taboola to merge on-site behavioral data with historical engagement metrics and cross-
28  domain activity derived from its publisher and advertiser network.

164.    The Taboola Tracker supports Defendant's marketing and monetization operations by integrating the Website into Taboola's demand-side targeting system. This allows Defendant to participate in sponsored content placement and behavioral retargeting campaigns, serving personalized recommendations or product promotions to prior visitors across other websites in the Taboola network. The result is an advertising loop in which activity recorded on the Website informs audience segmentation and content delivery elsewhere online.

165.    Through its analytics and campaign reporting functions, the Taboola Tracker also provides Defendant with ongoing visibility into user engagement, conversion, and attribution performance. This closed-loop feedback system enables real-time optimization of marketing strategies and revenue allocation. In this way, the Taboola Tracker functions as a core behavioral data conduit between the Website and Taboola's advertising infrastructure, supporting continuous user profiling, content personalization, and cross-platform marketing integration

166.    Figure 16 below shows a packet capture recording a series of DNS exchanges between Source 10.2.0.2 and Destination 9.9.9.9 resolving multiple Taboola endpoints, including cdn.taboola.com, trc.taboola.com, psb.taboola.com, pips.taboola.com, and cds.taboola.com. Each Standard query and corresponding response lists the A record assignments returning IP addresses within the Fastly-hosted ranges 151.101.1.44, 151.101.65.44, 151.101.129.44, and 151.101.193.44, as well as 141.226.224.32 for us-cds.taboola.com. These events occurred in rapid sequence beginning at approximately 28.9 seconds into the capture, confirming near-simultaneous domain resolution across multiple Taboola subdomains. The displayed data provides verifiable network evidence of the addressing and routing metadata exchanged during live resolution, documenting how the client's source IP and query path were transmitted to external Taboola-controlled hosts as part of the session's signaling process.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 16:**



167.   Figure 17 below shows a network entry identifying a JavaScript file labeled "tfa.js" retrieved from cdn.taboola.com under the path /libtrc/unip/1456664/tfa.js. The capture indicates that this resource was requested using the GET method via HTTPS at 0 ms of page load, meaning it executed immediately upon initialization of the Website session. The table further shows that this transmission occurred within the first of 308 total requests recorded, with 0.0 kB uploaded and 546 kB downloaded. The displayed data documents the addressing and signaling exchange between the browser and Taboola's external content delivery host, establishing that a third-party script was fetched and executed automatically as part of the Website's initial load sequence.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 17:**



168.   Figure 18 below shows an HTTPS request to trc.taboola.com recorded in Fiddler, with the Host field identifying trc.taboola.com and the Method listed as GET. The captured URL begins https://trc.taboola.com/…[full URL omitted] and includes visible parameters such as tim=1762252474309, data=%7B%22id%3A802, and ref=https%3A%2F%2Fvice01.skechers.com%2F. Response headers include HTTP/1.1 200 OK, Content-Type: application/javascript; charset=utf-8, and Set-Cookie: taboola_session_id=v2_d9371f442d8c413116dceb76768d4387. Additional headers show User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X), Accept-Encoding: gzip, deflate, br, zstd, and Accept-Language: en-US,en;q=0.9. The displayed data provides direct evidence of addressing and signaling metadata confirming that the browser transmitted behavioral and device-level parameters, including the current URL, referring URL, and session identifiers, to an external Taboola domain through a live HTTPS exchange.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 18:**



169. Figure 19 below shows a Fiddler capture documenting an HTTPS transaction with Host trc.taboola.com, using the GET method for the path /1456664/trc/…[full URL omitted]. The request headers include Accept: /, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, and User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X). The Referer field specifies https://vice01.skechers.com/…[full URL omitted], and the connection is noted as keep-alive. The response headers list HTTP/1.1 200 OK, Content-Type: application/javascript; charset=utf-8, Set-Cookie: taboola_session_id=v2_d9371f442d8c413116dceb76768d4387; Domain=.taboola.com; Path=/, and Via: 1.1 varnish. The displayed data provides verifiable network evidence of the addressing, routing, and signaling metadata exchanged during the client's live connection to Taboola's remote host, including both the persistent identifier set by the external server and the intermediate routing layer indicated by the Via header.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 19:**



170.    Figure 20 below shows a visible cookie table capturing multiple persistent identifiers established during the Website session, including entries directly associated with Taboola domains. The table lists cookies such as Ot_gid with value 1a621cc9-7c71-4b34 under taboola.com, t_pt_gid under taboola.com, and taboola_session_id with value v2_d9371f442d8c413116dceb76768d4387 under .taboola.com, each reflecting expiration dates extending through 2026. These cookies appear alongside other third-party identifiers from rubiconproject.com, adsrvr.org, udmserve.net, and snapchat.com, confirming that multiple external hosts wrote persistent identifiers to the client's browser. In context with prior figures showing DNS lookups and HTTPS transactions to trc.taboola.com and cdn.taboola.com, the presence of these taboola.com cookies confirms that the browser both transmitted addressing information to Taboola's servers and received unique identifiers in return. The displayed data thus constitutes verifiable network evidence linking Taboola's endpoints to the establishment of persistent identifiers within the client's local storage, demonstrating the bidirectional exchange of addressing and signaling metadata during the Website session.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 20:**



171.    Figures 16 through 20 collectively depict the full Taboola communication sequence on the Website, beginning with the browser's DNS resolution of multiple Taboola subdomains and culminating in the assignment of persistent identifiers stored in local cookies. Figure 16 shows the initial DNS lookups from client IP 10.2.0.2 to cdn.taboola.com, trc.taboola.com, psb.taboola.com, pips.taboola.com, and cds.taboola.com, all resolving to Fastly-hosted IP ranges (151.101.x.x), confirming the browser's direct outbound connection to Taboola's delivery infrastructure. Figure 17 then records the automatic retrieval of the tfa.js script from cdn.taboola.com at the start of the session, establishing that Taboola's JavaScript asset loaded without user interaction. Figure 18 documents a live GET request from the browser to trc.taboola.com transmitting JSON-formatted metadata fields including url, ref, device type, and user-agent, evidencing real-time transmission of behavioral and device-level information to Taboola. Figure 19 captures the server's 200 OK response from trc.taboola.com containing Set-Cookie headers and a Via: 1.1 varnish routing field, showing the return path and the assignment of a session identifier through Taboola's infrastructure. Finally,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Figure 20 displays the resulting cookies written to the browser's local store, including taboola_session_id, t_pt_gid, and Ot_gid under taboola.com, with expiration dates extending into 2026. Together, these figures form a continuous evidentiary chain demonstrating that Taboola's code executed automatically during the Website session, initiated direct communication with Taboola's servers, and produced persistent identifiers—constituting a complete sequence of addressing, signaling, and storage operations that reflect intentional third-party interception and assignment of unique user identifiers.

172. Defendant surreptitiously installed, executed, and injected the Taboola Tracker onto users' browsers by embedding Taboola's JavaScript library and content recommendation scripts within the Website's source code. When a user visits the Website, the browser automatically executes these scripts, triggering outbound requests to Taboola's servers and transmitting metadata including the user's page URL, referrer, device type, and browser configuration. These transmissions occur automatically and invisibly during the initial page load, enabling Taboola to collect and associate communication signals from users' sessions without their knowledge or consent.

173. The Taboola Tracker is at least a "process" because it consists of software designed to identify consumers, collect data from their communications, and correlate that data with unique identifiers for later use.

174. The Taboola Tracker is at least a "device" because the software operates through users' computing hardware and browser environment, which execute the embedded code and establish live connections with Taboola's remote servers.

175. The Taboola Tracker captures and transmits routing, addressing, and signaling information—including the user's page URL, referrer, and browser metadata—to Taboola's servers as soon as the Website loads. This metadata reveals the origin and destination of the user's electronic communications and is not transmitted at the user's initiative, but rather by code executed automatically within the Website. Through this mechanism, Taboola intercepts and records live connection data while the

communication is in transit, associating the user's session with identifiers such as taboola_session_id and t_pt_gid without authorization.

176. Defendant never obtained a court order permitting the installation of any pen register or trap and trace process and did not obtain Plaintiff's or the Class Members' express or implied consent to install or execute the Taboola Tracker on their browsers or to transmit their addressing and signaling data to Taboola.

177. Consequently, the Taboola Tracker constitutes an unlawful pen register and/or trap and trace process within the meaning of CIPA, because it captures and transmits addressing and routing information from users' communications without consent or judicial authorization.

### 3.    *The Trade Desk Tracker*

178. The Trade Desk tracker, delivered through domains such as adsrvr.org or related subdomains, is a third-party advertising and data exchange platform operated by The Trade Desk, Inc. On the Website, the tracker is embedded in the source code and initiates an automatic connection to The Trade Desk's infrastructure as soon as a page is loaded. Once triggered, the tracker transmits addressing and device-level metadata including IP address, browser configuration, referrer, and other session parameters. These transmissions occur automatically and continuously, establishing a background exchange between the user's browser and The Trade Desk's remote servers that captures identifiers and network-based information without user interaction.

179. When active, The Trade Desk tracker performs real-time data routing and identifier synchronization, linking the user's browser session to unique IDs such as TDID stored under adsrvr.org. This process enables persistent identity matching across multiple contexts and allows The Trade Desk's platform to associate a user's browsing session on the Website with existing advertising profiles. The resulting ID correlation functions as an identity-resolution layer within the digital advertising ecosystem, facilitating cross-domain and cross-session attribution.

/ / /

180.   The data obtained through The Trade Desk's connection supports behavioral profiling, audience segmentation, and advertising optimization by categorizing users according to prior interaction history, device type, and inferred preferences. These processes allow Defendant to integrate The Trade Desk's data exchange into its on-site behavioral analytics and audience-targeting pipelines. By combining connection-level metadata with event-based inputs from the same session, The Trade Desk's integration enhances the precision and scope of behavioral data linked to users' activities on the Website.

181.   Figure 21 below shows DNS query and response entries recorded between the client at 10.2.0.2 and resolver 9.9.9.9 for multiple Trade Desk–associated domains. The entries display outbound DNS queries for js.adsrvr.org, insight.adsrvr.org, and match.adsrvr.org, followed by corresponding replies identifying destination IPs including 3.165.167.99, 35.71.131.137, 3.33.220.150, 15.197.193.217, and 52.223.40.198. Each exchange visibly documents the query identifiers 0x3c23, 0xc60f, and 0xe079, confirming sequential lookups from the same client host during the browsing session. The query responses also include a canonical name (CNAME) resolution for js.adsrvr.org to dg2iu7dxxehbo.cloudfront.net, showing that the requested host resolves through Amazon's CloudFront infrastructure. The displayed data provides verifiable network records evidencing the addressing and routing path through which the browser initiated external name resolutions to The Trade Desk's ad-serving domains, thereby documenting the initial transmission of the client's addressing information to remote servers prior to any user interaction.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 21:**



182.    Figure 22 below shows browser network entries recorded in the Developer Tools panel, listing simultaneous outbound requests to The Trade Desk domains. The visible rows display file names and paths including universal_pixel.js, up_loader.1.1.0.js, /track/cei, and /track/realtimeconversion, each served from js.adsrvr.org, match.adsrvr.org, or insight.adsrvr.org. The "Method" column identifies GET and POST transactions conducted over HTTPS, with the "Protocol" column showing http/2 and measured response times of 0 ms to 153 ms. Each entry appears at the initial milliseconds of the session, confirming automated transmissions triggered immediately upon load. The displayed data constitutes direct evidence of addressing, routing, and signaling exchanges between the browser and The Trade Desk's servers, documenting how the Website's embedded scripts initiated live network connections to remote endpoints without user action and transmitted structured metadata defining the communication context for this transaction.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 22:**



183.    Figure 23 below shows live network entries captured in Fiddler evidencing HTTPS transactions between the browser and multiple external hosts, including adservice.google.com, fonts.googleapis.com, s.yimg.com, insight.adsrvr.org, match.adsrvr.org, static.whatsapp.net, and other third-party domains. The visible row for match.adsrvr.org shows a request to the path /track/ce with query parameters advertiser_id=plxujm6, cookie_sync=1, upv=3.0.0, upid=loyd40y, paapi=1, ref=https://www.skechers.com/, and redirect=1. Each parameter appears with a discrete value corresponding to visible key–value pairs. The response status codes display as 200, indicating successful exchanges over the HTTPS protocol. The displayed data constitutes direct evidence of the addressing and signaling metadata contained in the payload, demonstrating that the Website initiated real-time transmissions to The Trade Desk's infrastructure. The parameters advertiser_id, upid, and cookie_sync show that the payload included both domain-specific and user-specific identifiers, confirming an active identifier exchange between the Website and The Trade Desk within a live browser session.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 23:**



184.    Figure 24 below shows network request metadata captured in the browser's Developer Tools panel, displaying visible headers and connection fields for an HTTPS exchange with match.adsrvr.org. The request line includes the full path https://match.adsrvr.org/…[full URL omitted], with parameters such as advertiser_id=plujm68, cookie_sync=1, upv=3.0.0, upid=loyd40y, ref=https://www.skechers.com/, and redirect=1. The "Status Code" field shows 200 OK, and the "Remote Address" field lists 17.248.171.53:56. Header entries include "Server: Kestrel," "Content-Type: text/html," "Referer: https://www.skechers.com/," and "User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/18.5 Mobile/15E148 Safari/604.1." These parameters appear together with fields such as "Accept-Encoding: gzip, deflate, br," "Sec-Fetch-Site: cross-site," and "Sec-Fetch-Mode: navigate," demonstrating complete request–response signaling between the browser and the external host. The displayed data captures the addressing, routing, and signaling elements of the observed connection, including the remote endpoint, origin reference,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  and device metadata transmitted in real time between the client and The Trade Desk's
2  infrastructure.

3  **Figure 24:**

4



16  185.  Figure 25 below shows the browser's cookie storage panel listing multiple
17  entries under various domains, including skechers.com, rubiconproject.com,
18  taboola.com, adsrvr.org, doubleclick.net, udmserve.net, and others. Each row displays
19  visible name–value pairs such as "dwsid = 33v4cwJYKGj2PjxRzKM_25J…," "FPID =
20  FPID2.2.Osa8%2FJXVXo6W…," "IR_PI = dced2994-b969-11f0-8a08…," and "Oirld
21  = LzEGW5MyGUy7Y2STS%3…." The entry for adsrvr.org includes a field labeled
22  "TTDID" with value "028c9278-4be1-4fad-91bc…," a visible expiration date of
23  November 2026, and a path of "/." Additional identifiers appear for taboola.com
24  ("t_gid," "t_pt_gid," "taboola_session_id") and rubiconproject.com ("khaos,"
25  "khaos_p"). These paired identifiers are displayed alongside timestamp and domain
26  information showing structured metadata across multiple hosts. The displayed data
27  constitutes direct evidence of client-side identifier assignment and persistent cross-

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

domain cookies, documenting the addressing and session-state metadata that link the browser environment to external domains including adsrvr.org.

**Figure 25:**



186.    Figures 21 through 25 together depict a continuous sequence of browser-level evidence showing how the client device established outbound communications with adsrvr.org and related third-party domains during the skechers.com session. The DNS records in Figure 21 show successive A-record lookups resolving js.adsrvr.org, insight.adsrvr.org, and match.adsrvr.org to Amazon-hosted IP addresses, confirming external address resolution from client 10.2.0.2 to resolver 9.9.9.9. Figure 22 displays the DevTools network log in which the browser automatically initiated multiple GET and POST requests to endpoints such as match.adsrvr.org/track/cei/… and insight.adsrvr.org/track/realtimeconversion … within milliseconds of page load. Figure 23 shows the associated Fiddler capture documenting parameter fields including "advertiser_id," "upid," "ref," and "cookie_sync," recorded as part of the active network payload. Figure 24 captures the live header display for the same request, including Status Code 200 OK, Remote Address 17.248.171.53:56, Server Kestrel, Referer

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

skecher.com, and User-Agent Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X), evidencing real-time transmission of addressing and signaling metadata from the client to The Trade Desk's infrastructure. Figure 25 shows the persistent cookies stored after those connections, including a TTDID identifier under adsrvr.org with expiration in November 2026. Collectively, the displayed data demonstrate a continuous network sequence encompassing DNS resolution, script execution, request headers, and cookie assignment—constituting verifiable evidence of addressing, routing, and session-state metadata exchanged between the skecher.com website and adsrvr.org.

187.    Defendant surreptitiously installed, executed, embedded, or injected the Trade Desk script onto users' browsers by deploying JavaScript code that triggers communication with Trade Desk's advertising and identity infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to Trade Desk's servers—including js.adsrvr.org, match.adsrvr.org, and insight.adsrvr.org—and transmitting user metadata such as IP address, page URL, and device information. These transmissions occur silently and without any user action, allowing Trade Desk to receive and process addressing and signaling data about users' interactions with the Website in real time.

188.    The Trade Desk script is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data across browsing sessions through identifiers such as "TTDID," "upid," and "advertiser_id."

189.    The Trade Desk script is at least a "device" because in order for software to function, it must be run on a computing device. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

190.    The Trade Desk script initiates connections to its network infrastructure upon page load via JavaScript libraries located at js.adsrvr.org/universal_pixel.js and related tracking endpoints at match.adsrvr.org/track/cei/ and insight.adsrvr.org/track/realtimeconversion/. These communications capture user

metadata including IP address, browser version, referrer URL, and timestamps—all of which constitute routing and signaling information under CIPA.

191. The user does not intentionally initiate any communication with Trade Desk; rather, the connection is automatically triggered in the background by embedded third-party code operating within the Website's source. As a result, Trade Desk is able to silently intercept and record communication-related data generated during the user's interaction with the Website. In this way, the Trade Desk script functions as a surveillance mechanism that captures third-party addressing and signaling information.

192. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Trade Desk script on Plaintiff's and Class Members' browsers or to collect or share data with Trade Desk.

193. Consequently, the Trade Desk script violates CIPA by constituting an unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

## 5. The Trackers Work Together Collectively To Achieve Defendant's Goal of Invasive Behavioral Aggregation

194. From the moment the Website loaded, the Plaintiff's browser initiated a coordinated sequence of background transmissions to multiple third-party advertising and identification services embedded within the Website's source code. These requests were not triggered by any visible interaction, but by scripts and JavaScript libraries executing automatically as the page rendered. The network evidence shown in Figures 9 through 15 captures the initial chain of communications with Google and DoubleClick endpoints, while Figures 16 through 25 document subsequent connections with Taboola and The Trade Desk infrastructure, including taboola.com, js.adsrvr.org, match.adsrvr.org, and insight.adsrvr.org. Collectively, these records show that the browser established live connections with multiple third-party domains in rapid succession, each exchange transmitting addressing, routing, and signaling metadata

unique to the Plaintiff's device. Within milliseconds, these communications generated a composite digital fingerprint containing the Plaintiff's IP address, device type, browser configuration, and referrer context—well before any opportunity for consent or awareness existed.

195.   Figures 9 through 15 document the initial cascade of outbound requests to Google and DoubleClick servers, where the browser relayed referrer URLs, client identifiers, and browser metadata in structured form. These transmissions reflect the beginning of a behavioral data chain in which the Plaintiff's local browsing environment becomes a live input to external analytic systems. The visible fields show a machine-readable record of when, from what device, and under what configuration the Plaintiff connected—information capable of being linked across sessions and properties to reconstruct patterns of online behavior and engagement.

196.   Figures 16 through 20 record the Plaintiff's browser resolving and loading JavaScript assets and session cookies from taboola.com. The captured requests include cookie identifiers such as "t_gid," "t_pt_gid," and "taboola_session_id," along with standard HTTP header fields including Referer, User-Agent, and Accept-Language. These entries show two-way exchanges in which the Website transmitted addressing and signaling metadata to Taboola's network while Taboola responded by returning cookie-based identifiers and JavaScript payloads. This established a persistent external connection between the Plaintiff's device and Taboola's servers capable of linking referrer and device information across sessions.

197.   Figures 21 through 25 capture sequential DNS and HTTPS transactions between the Plaintiff's browser, resolver 9.9.9.9, and The Trade Desk's domains js.adsrvr.org, match.adsrvr.org, and insight.adsrvr.org. These interactions document explicit name-resolution requests followed by GET and POST calls carrying parameters including "advertiser_id," "upid," "ref," and "cookie_sync." The evidence establishes that the Defendant's Website initiated the collection, transmission, and enrichment of

1  the Plaintiff's network and device identifiers through direct connections with The Trade
2  Desk's infrastructure without any deliberate user action.

3      198.    Viewed together, Figures 9 through 25 depict a continuous and coordinated
4  flow of private addressing and behavioral data from the Plaintiff's device to multiple
5  external servers operated by Google, DoubleClick, Taboola, and The Trade Desk. Each
6  exchange contributes a discrete layer of identifying information—routing paths, device
7  attributes, and session signals—that together enable persistent recognition and profiling.
8  This hidden, automated transfer of communication metadata constitutes behavioral
9  surveillance within the meaning of CIPA: a system that extracts, records, and
10 disseminates the Plaintiff's private signaling and addressing information without notice,
11 consent, or judicial authorization.

## VI.    CLASS ALLEGATIONS

13     199.    Plaintiff brings this action individually and on behalf of all others similarly
14 situated (the "Class" or "Class Members") defined as follows:

15            All persons within California whose browser was subject to installation,
16            execution, embedding, or injection of the Trackers by the Defendant's
17            Website during the relevant statute of limitations period.

18     200.    The Class does not include (1) Defendant, its officers, and/or directors; (2)
19 the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's
20 staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

21     201.    Plaintiff reserves the right to amend the above class definition and add
22 additional classes and subclasses as appropriate based on investigation, discovery, and
23 the specific theories of liability.

24     202.    **NUMEROSITY:**  Plaintiff does not know the number of Class Members
25 but believes the number to be in the thousands, if not more. The exact identities of Class
26 Members can be ascertained by the records maintained by Defendant.

27     203.    **COMMONALITY:**  Common questions of fact and law exist as to all
28 Class Members and predominate over any questions affecting only individual members

of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

204. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

205. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

206. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## VII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

207.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

208.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

209.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

210.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1.  An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.  An order declaring that Defendant's conduct violates CIPA;

3.  An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4.  An order enjoining Defendant's conduct as alleged herein;

5.  Statutory damages pursuant to CIPA;

6.  Prejudgment interest;

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   November 20, 2025      **NATHAN & ASSOCIATES, APC**

By: _/s/_ Reuben D. Nathan
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED